John DOE, Plaintiff,

v.

PERRY COMMUNITY SCHOOL DISTRICT; Randy McCaulley, Individually and in his Official Capacity as Superintendent of Perry Community School District; Dan Marburger, Individually and in his Official Capacity as Principal of the Perry High School; Bob Gittens, Individually and in his Official Capacity as Associate Principal of the Perry High School; Jerry "Pat" Jans, Individually and in his Official Capacity as School Resource Officer in the Perry Community School District, and Individually and in his Official Capacity as a Police Officer for the Perry, Iowa, Police Department; and the City of Perry, Iowa, Defendants.

No. 4:04–CV–40161.

United States District Court, S.D. Iowa, Central Division.

April 29, 2004.

810

Robert P. Montgomery, Montgomery Law Office, Des Moines, IA, for plaintiff.

John D. Jordan, Kirke C. Quinn, Payner, Jordan, Mahoney, Jordan, Hunziker & Rhodes LLP, Madrid, IA, Harry Perkins, III, Patterson Lorentzen Duffield Timmons, Des Moines, IA, for defendants.

### ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

GRITZNER, District Judge.

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Clerk's No 2). Attorney for Plaintiff is Robert Montgomery; attorneys for Defendants are Kirke Quinn, representing Perry Community School District and those associated with the school district, and Harry Perkins III, representing the City of Perry and those associated with the City. A hearing was requested by Plaintiff on an expedited basis, and the Court scheduled a hearing as soon as was reasonable for the parties. Evidence was received and oral argument presented in that hearing on April 15–16, 2004. The

Motion for Preliminary Injunction is now fully submitted to the Court.

## PROCEDURAL HISTORY

Plaintiff, John Doe ("Doe"), filed a Complaint in this Court on March 18, 2004. The Complaint listed as Defendants the Perry Community School District ("the District"), Randy McCaulley, individually and in his official capacity as Superintendent of Perry Community School District ("Superintendent McCaulley"), Dan Marburger, individually and in his official capacity as Principal of Perry High School ("Principal Marburger"), Bob Gittens, individually and in his official capacity as Associate Principal of Perry High School ("Mr.Gittens"), Jerry "Pat" Jans, individually and in his official capacity as School Resource Officer in the Perry Community School District, and individually and in his official capacity as a police officer for the Perry, Iowa, Police Department ("Officer Jans"), and the City of Perry ("Perry" or "the City"). Jurisdiction was invoked under the federal question statute, 28 U.S.C. § 1331, as this is a civil action asserting claims arising under 42 U.S.C. §§ 1983, 1985, and 1986, for violations of constitutional and civil rights, including those contained in the First Amendment, and the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, and for violation of Title IX, pursuant to 20 U.S.C. § 1681. The other ancillary state claims are brought pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

Simultaneous with the filing of his Complaint, Plaintiff filed a Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65. Defendants have resisted Plaintiff's motion and resist issuance of any sort of preliminary injunction in the matter. Plaintiff requested expedited relief on the motion, which the Court has attempted to satisfy while still allowing Defendants sufficient opportunity to meet the charges leveled against them and adequately defend against the pending motion. To this end, the Court scheduled and heard oral argument on the motion in a hearing that stretched into two days, on April 15–16, 2004. Plaintiff and all Defendants were represented by counsel, and both sides had opportunity to present witness and exhibit evidence relevant to the pending motion.

In his motion, Plaintiff requests that the Court enter a preliminary injunction that accomplishes the following:

(1) Enjoins the Defendant, Perry Community School District and its administrators and officials, from taking any adverse action against the Plaintiff, including suspension, in response to his speaking out in the halls of the school in protest against hate-based discrimination or threats, including specifically, hate-based statements, harassment, discrimination, or threats lodged against the Plaintiff individually.

(2) Enjoining the Defendant City of Perry Police Department, Defendant Police Officer Jans, and any and all other officers within the department, including any officer assigned as a Student Resource Officer at Perry High School, from arresting, and/or charging, and/or taking adverse action against Plaintiff in response to his speaking up, in or on the premises of Perry High School, against hate-based discrimination and/or harassment, including specifically, hate-based discrimination, and/or harassment, and/or statements and/or threats directed specifically toward the Plaintiff by other students, teachers, administrators, or employees of Defendant school.

In addition, at the hearing the Plaintiff further requested the additional remedy that the Court include in the preliminary

injunction an order requiring the Defendants to "affirmatively enforce the harassment policy [of the school district] with regard to intolerance and harassment against homosexuals," insofar as such injunctive relief is available under Title IX and section 1983. The motion is fully submitted, and the Court analyzes the Plaintiff's motion in light of the evidence received and the corresponding filings made by the parties.

## BACKGROUND FACTS

The matter currently before the Court relates solely to the request for a preliminary injunction, essentially involving the exercise of the Plaintiff's rights of expression. In order to understand the background for these more specific issues, a more general overview of the Plaintiff's claims must be provided. However, the consideration of the majority of the Plaintiff's claims is left to another day.

Doe is an 18–year–old student in his senior year of high school at Perry High School, located in Perry, Iowa. He participated in school athletics as a member of the football and wrestling teams at the school and otherwise participated fully in the educational offerings of Perry High School throughout most of the time period that makes up the current action.

Due in large part to the incidents giving rise to the environment that prompted the current lawsuit by Plaintiff, Doe is currently receiving instruction at his home in anticipation of graduating from high school concurrently with the members of his high school class. He receives 45 minutes of instruction three days a week from a teacher provided by the District. The remaining outside work is to be completed by Doe. Doe desires to return to high school provided it is a safe environment for him.

The District is a public school district duly organized under the laws of the State of Iowa and doing business in Dallas County, Iowa. The District is responsible for educating students in the surrounding community. It controls and manages the public schools in Perry, Iowa, including Perry High School ("the School"), where the events that form the basis of this action allegedly took place.

Superintendent McCaulley was working as an employee and agent of the District as Superintendent of the District at all times material to the present action. He supervises all teachers, administrators, coaches, student resource officers, and other employees within the District. Superintendent McCaulley is further in charge of establishing and/or enforcing the rules, regulations, and policies of the schools within the District, and overseeing the discipline of students at the schools. Superintendent McCaulley is a person for the purposes of 42 U.S.C. § 1983 and was allegedly operating at all times material as an employee of the District in his official capacity under the color of state law.

Principal Marburger was working as an employee and agent of the District as the Principal of Perry High School at all times material to the present action. He supervises, or assists in supervising, all teachers, administrators, coaches, student resource officers, and other employees at Perry High School. Principal Marburger is further in charge of establishing and/or enforcing the rules, regulations, and policies at Perry High School, and overseeing the discipline of students at the school. Principal Marburger is a person for the purposes of 42 U.S.C. § 1983 and was allegedly operating at all times material as an employee of the District in his official capacity under the color of state law.

Mr. Gittens was working as an employee and agent of the District as the Associate Principal of Perry High School at all times material to the present action. He supervises, or assists in supervising, all teach-

ers, administrators, coaches, student re-source officers, and other employees at Perry High School. Mr. Gittens further assists in establishing and/or enforcing the rules, regulations, and policies of the Perry High School, and takes care of approximately 95 percent of the discipline of students at the school. He is also an assistant wrestling coach at the school. Mr. Gittens is a person for the purposes of 42 U.S.C. § 1983 and was allegedly operating at all times material as an employee of the District in his official capacity under the color of state law.

Officer Jans was working as an employee and agent of the District as a Resource Officer at Perry High School at all times material to the present action. He was contemporaneously employed as a police officer with the City of Perry, Iowa, Police Department. Officer Jans is a person for the purposes of 42 U.S.C. § 1983 and was allegedly operating at all times material as an employee of the District in his official capacity under the color of state law.

Perry is a municipal corporation organized and authorized to operate under the laws of Iowa. City headquarters are located in Perry, Dallas County, Iowa. The City is responsible for maintaining and operating the Perry City Police Department.

Doe alleges that for the past three plus years he has been the victim of hate-based discrimination and harassment, including hate-based assaults and threats of violence, within the Perry High School community as a result of his perceived sexual orientation. Plaintiff alleges that he is perceived as homosexual, and as a result, he has been subjected to severe verbal and physical harassment, demeaning behavior and treatment, and that he has suffered physical and emotional damage arising from a hostile environment that pervades Perry High School. Doe claims this hostile environment has been fostered, or at least acquiesced in, by Defendants, and that Defendants have failed to provide him with a safe learning environment. According to Doe, it was out of a concern for his safety that he brought the present action and opted to be home schooled.

Without delineating every specific incident of harassment or discrimination alleged by Plaintiff, the Court notes that Doe was allegedly subjected to severe and pervasive harassment throughout his tenure as a student at Perry High School. Doe alleges harassment from no less than forty individual students at the school, in addition to discriminatory and demeaning treatment by teachers and administrators at the school. Perry High School has a total average population of approximately 600 students. Plaintiff claims the number of incidents perpetrated against him have ranged in the dozens if not hundreds.[1]

The majority of the alleged instances of harassment involving other students consist primarily of the use of anti-gay epithets or homophobic comments aimed at Plaintiff. The epithets used include, but are not limited to, "gay", "queer", "homo", "pussy", "fag", and "faggot".[2] On one specific occasion, a fellow student and teammate on the wrestling team removed Doe's

1. In the following paragraphs, the Court will discuss the instances of harassment encountered by Doe. The Court has attempted to avoid unnecessary use of derogatory terminology or recitation of events for shock value. Due to the multiple alleged instances of harassment, and the importance of understanding Plaintiff's specific claims, the Court has found it necessary to include some graphic and disturbing discussion, including derogatory and demeaning terms and offensive expletives.

2. The Court notes that these terms are bandied about with some regularity by youth in today's society with no apparent intent to label the recipient as a homosexual. In this case, however, Doe has alleged such name-calling was based primarily and expressly on his perceived sexual orientation, and Defen-

cell phone from his bag at a wrestling match and typed the phrase "Huge Homo" on the greeting screen. For this, the student was originally punished by the School.[3] Doe also had his locker posters[4] vandalized and defaced on a regular basis with similar anti-gay sentiments.

In addition, Doe alleges he has been threatened on multiple occasions based on his perceived sexual orientation where the perpetrators stated they would "fuck [Plaintiff] up", "kick [Plaintiff's] ass", along with other voiced threats of physical harm. On several occasions Doe was allegedly physically assaulted by fellow students because of his perceived sexual orientation. This included being pushed in the halls and lunch areas of the school[5] and being urinated on in the shower room.[6] In addi-

tion, Doe was allegedly taunted about his perceived sexual orientation and proclivities. While some of this conduct occurred in conjunction with football and wrestling activities, much of it also is said to have occurred in the halls, lunch areas, classrooms, and grounds of Perry High School.

Doe further alleges discriminatory conduct on the part of teachers and administrators of the School. He claims that in response to numerous complaints brought by himself to School officials, no disciplinary action was taken against the offending students. Doe also states that he was told by Gittens and/or Principal Marburger that the incidents were "no big deal", or that he should "get tougher skin", "get used to it", and "grow up".[7] Additionally, Doe alleges that teachers and School offi-

---

dants have not submitted evidence to rebut the presumption that the words mean what they say. At this point in the proceedings, the Court characterizes the terms as anti-gay epithets, though this classification may be subject to review at a later time. In any case, the use of anti-gay epithets, homophobic comments, or other forms of "gay bashing" is a serious problem in our schools. *See Chambers v. Babbitt*, 145 F.Supp.2d 1068, 1073 (D.Minn.2001) (stating that "studies show that more than ninety percent of high school students hear negative comments regarding homosexuality during the day. It is no wonder that there are significantly higher reports of depression and suicide amongst our GLBT [Gay, Lesbian, Bisexual, Trans-gendered] youth, a problem that cannot be ignored.").

3. According to Plaintiff, this student was originally given three days in-school suspension and was told he would miss two wrestling events. Doe claims the suspension was later reduced by school officials to two hours of suspension and one missed wrestling meet. Doe also claims, however, that the disciplined student was allowed to ride on the same bus as Plaintiff to the wrestling event from which that student was suspended and that he continued to berate and attack Doe during this time. In addition, Doe claims he was harassed by one of the wrestling parents at that meet for complaining about the fellow wrestler and getting him suspended.

4. According to the testimony, cheerleaders at the school would make posters for those participating in an upcoming athletic event, and would then post those posters on the participants' lockers on the day of the scheduled athletic event.

5. The most severe of these violent confrontations occurred on May 8, 2002. This event is central to Plaintiff's motion and will be fully discussed below.

6. Plaintiff alleges a fellow student urinated on him in the shower after a wrestling practice during his sophomore year. Mr. Gittens testified of being aware of one other incident where Plaintiff complained he was urinated on following a wrestling practice, this time as a senior. Mr. Gittens further testified that upon being made aware of the incident, he immediately went to the shower area where he witnessed the wrestlers engaging in "horseplay," whence he immediately gave them a "dressing down" about their conduct. Mr. Gittens testified this was the only incident he was aware of wherein Plaintiff alleged he was subjected to this behavior.

7. The Court cannot discern on the present record if the statements were given in a manner to downplay or ignore the offending conduct, or with a purpose of concern and counsel for Doe, similar to advice a parent or

cials were present or overhead some of the harassing conduct to which he was subjected, and they took no steps to end the conduct. Plaintiff also contends that School officials undertook no effective discipline in response to the myriad reports of harassment he brought to their attention. Doe further alleges one teacher criticized him for speaking out and that the teacher further stated he had "the biggest mouth in the south." Doe also contends the District did not properly react to a letter sent to the District by Doe's doctor, wherein the doctor referenced Plaintiff's suicidal tendencies and made the assessment that Doe's stress, fear, and anxiousness were exacerbated by the hostile environment prevalent at Perry High School.

The altercation that will be the crux of Plaintiff's argument on the pending motion for preliminary injunction occurred at Perry High School on May 8, 2003. This incident occurred near the end of Plaintiff's junior year at the school. As can best be determined on the record,[8] a student known to Plaintiff yelled "bad ass" at Doe as he was leaving the parking lot on May 7. Doe did not respond. The following day, May 8, Doe heard reports at school that this same student was telling people that he would "fuck [Doe] up any time and that [Doe] was a pussy and . . . a fucking queer."

In reaction to the current matter, Doe approached Officer Jans in his position as

School Resource Officer at Perry High School. Doe informed Officer Jans of the harassment and threats by the fellow student and requested his advice in how to stop this treatment and keep himself out of trouble. According to Doe, Officer Jans told him that he had two options. First, he could ignore the offending student and let it be; or second, he could confront the student where there are a lot of people present, ask him if he had indeed made the statements attributed to him, and then make him look bad in public. Officer Jans admits to meeting with Doe on this date and discussing alternatives for addressing the issue, and he admits that the second option was to discuss the issue with the fellow student in the presence of others that could witness the conversation; but he denies he urged Plaintiff to attempt to humiliate the other student in public during such confrontation. Admittedly, Officer Jans at no time told Doe to engage in a physical confrontation with the alleged harasser.[9] Doe returned to class following the conversation with Officer Jans.

Later in the day, Doe approached the alleged harasser in the halls between class periods. Doe "chose to confront him" and called the other student over and asked if he had "been talking shit." The other student allegedly responded in the affirmative and told Doe that he would "fuck you up anytime" and called Doe a "fucking fag."[10] The alleged harasser then walked

coach may give to a young person dealing with the teasing and taunting that is pervasive in adolescence.

8. The testimony of the May 8 altercation differs somewhat from the account repeated in Plaintiff's multiple filings. Both of these differ in some respects from the account written by Doe the day after the altercation in a discrimination complaint filed by Plaintiff with the District. Where the accounts differ in some material aspect, the Court has relied on Plaintiff's written account, admitted by Court at the hearing as Plaintiff's Exhibit 10.

Due to the proximity in time between the event and the discrimination complaint, and the fact that Doe himself filled out the form, the Court finds the written record indicative of the actual sequence of events that make up the May 8 altercation.

9. Plaintiff states that when he asked Officer Jans what he should do if the other student hit him, Jans responded by telling Doe to "just stand there and let him hit you."

10. The Court notes that the record is devoid of any evidence from the other student or

away from Doe.[11] Doe then followed him to his locker and again confronted him. The other student again let forth a string of expletives and anti-gay epithets directed toward Doe and, as Doe was getting ready to walk away, pushed Doe. Doe pushed him back. The other student then swung at Doe and hit him. This was followed by another flurry of pushes between Doe and his alleged harasser.

Jim Ellenberger, a teacher at Perry High School, witnessed the two boys squared off against each other. He witnessed pushing between the boys and immediately placed himself between the two. At the same time, Mr. Emmert, another teacher at the school, arrived and helped Mr. Ellenberger break up the altercation. Mr. Ellenberger escorted Doe to the office area at the school, while Mr. Emmert followed with the other student.

Mr. Ellenberger states that Doe immediately calmed down and accompanied him to the office area without further complication. According to Mr. Ellenberger and other witnesses, the alleged harasser remained incensed and made several inflammatory remarks, including anti-gay epithets, as he was being led to the office a short distance behind Doe and Mr. Ellenberger. None of the witnesses overheard the confrontation between Doe and his alleged harasser that led to the altercation, nor were any of the witnesses able to determine if there was an initial aggressor in the altercation. Doe suffered minor injuries to his neck and ear during the altercation.[12]

Principal Marburger and Officer Jans were involved in the discipline of the two boys involved in the altercation.[13] Both Doe and his alleged harasser were given a three day out-of-school suspension. In addition, both boys were then arrested by Officer Jans and charged with disorderly conduct for participating in the altercation.[14] As a result of the altercation, both Doe and his parents filed discrimination complaints with the District. These complaints were investigated by Lynda Hoobin, the compliance or equity officer assigned by the District to investigate all such complaints. In a summary disposition of Doe's complaint, Ms. Hoobin determined the complaint inconclusive.[15]

other witnesses to the May 8 altercation regarding what was actually said between Doe and his alleged harasser in the moments preceding the altercation. For purposes of this motion, the Court recalls the Plaintiff's version of the events and notes that what was said between the parties does not materially affect the Court's determination of Plaintiff's motion.

11. This is according to Plaintiff's own statement as contained in the discrimination complaint dated the day following the May 8 altercation. The other versions of the event submitted in Plaintiff's filings do not recount this portion of the events leading up to the altercation. The Court finds the fact that Plaintiff doggedly pursued his alleged harasser, even after the other student walked away, significant in the ultimate determination of the issues relevant to the present motion.

12. Doe's neck was red, and he was seemingly bleeding from his ear as a result of the scuffle.

Defendants state in their resistance that both Doe and the other student sustained minor injuries, but there is no further evidence that the other student suffered any sort of injury.

13. While Mr. Gittens generally handled student discipline, he was away from the school on May 8, 2003, and did not immediately participate in the disciplinary decisions for Doe and the other student in the aftermath of the May 8 altercation.

14. This charge was later dismissed against Plaintiff. There is no indication of the resolution of the charge against the other student, which apparently would have been resolved as a juvenile matter.

15. The record does suggest flaws in the investigation by school administrators in the immediate aftermath of the altercation and later by Ms. Hoobin in response to Doe's discrimination complaint regarding the May 8 altercation. According to the record and testimony

Doe alleges that the incessant harassment by Perry High School students, coupled with the lack of effective and consistent discipline by the District and School administrators, has led to an environment filled with harassment, intimidation, and assaultive behavior such that he no longer feels safe at the school. He contends that the conduct of Defendants has crippled his ability to be provided with a safe learning environment and receive the education to which he is entitled. Doe claims that the harassment has caused him to miss a significant amount of classes in an attempt to avoid the harassment, thereby negatively affecting his grades and participation in the education opportunities at the school.

Doe asserts further that the harassing conduct of fellow students and the lack of help from school officials forced him to quit the wrestling team earlier this year. He further avers that the stress of the harassing environment has aggravated a physical and psychological disorder that he suffers. Doe claims Defendants have denied him equal protection and due process under the Fourteenth Amendment, infringed upon his First Amendment right to freedom of speech, committed education discrimination and harassment under Title IX, denied other constitutional and civil rights to which he is entitled, and violated additional state and common law protections and rights.

## ANALYSIS

The motion for preliminary injunction filed by Doe seeks relief in three respects: (1) that the District and its officials be enjoined from taking any adverse action against Plaintiff in response to his speaking out in the halls of the school against hate-based discrimination or threats; (2) that the Perry Police Department and its officers be enjoined from arresting, charging, or taking any other adverse action against Plaintiff in response to his speaking out in the halls of the school against hate-based discrimination or threats; and (3) that the Court order the District to affirmatively and fairly enforce its harassment policy with respect to harassment and discrimination against homosexuals or those perceived to be homosexual.[16] Plain-

at the hearing, no one ever contacted any of the three teachers that witnessed at least a portion of the altercation. One teacher made out a written statement that was then never provided to the compliance officer. However, while the Court by no means endorses the caliber of the investigation, this issue is not central to the current motion.

The Court does note, however, that Ms. Hoobin has or is currently investigating four separate complaints received from Doe or his parents. Three of those investigations have been completed, with one still pending. Of those completed, one resulted in a finding of founded, one was determined to be unfounded, and as stated above, the investigation into the May 8 altercation came back inconclusive. Ms. Hoobin stated that her process in investigating such complaints is to read the complaint and become familiar with the allegations, interview the complainant, conduct additional interviews as necessary, interview the alleged perpetrator, review notes, and make a determination. She claims this was the process she used in all of her investiga-

tions, including her investigation of the May 8 altercation.

16. The District does have an existing policy against harassment (Defendant's Ex. 1), that states the following in relevant part:

No Student in the Perry Community School District shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination in District programs on the basis of race, color, creed, gender, religion, marital status, parental status, national origin, disability, *sexual orientation,* or socio-economic background. The policy of the District shall be to provide educational programs and opportunities for students as needed on the basis of individual needs, interests, abilities and potential. The policy further delineates the complaint procedures to be followed, provides for a compliance officer, and provides a safeguard by protecting confidentiality and ensuring no retaliation will be tolerated against someone that has filed a discrimination complaint.

tiff concedes that he is not asking the Court to enjoin Defendants from performing their functions or to keep law enforcement from intervening if Plaintiff or anyone else commits a public offense that is not protected speech.

### A. Standard for Preliminary Injunction

Doe has moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. "A preliminary injunction is extraordinary relief and must be carefully considered." *Books, Inc. v. Pottawattamie County, Iowa*, 978 F.Supp. 1247, 1253 (S.D.Iowa 1997). In deciding a motion for preliminary injunction, the Court considers the following factors:

(1) The probability of success on the merits;

(2) The threat of irreparable harm to the movant;

(3) The balance between this harm and the injury that granting the injunction will inflict on the other interested parties; and

(4) Whether the issuance of an injunction is in the public interest.

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1178–79 (8th Cir.1998) (citations omitted); *see also Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir.1999); *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981); *Iowa Paint Mfg. Co. v. Hirshfield's Paint Mfg., Inc.*, 296 F.Supp.2d 983, 988 (S.D.Iowa 2003). These four factors have come to be known as the *Dataphase* factors. *See United Indus. Corp.*, 140 F.3d at 1178–79.

None of these factors is dispositive in itself in determining whether to issue a preliminary injunction. *Id.* at 1179; *see also Baker Elec. Co-op. Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994); *Calvin Klein Cosmetics v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir.1987). Indeed, these factors are not intended to create a rigid formula in assessing a motion for preliminary injunction. *Baker Elec. Co-op., Inc.*, 28 F.3d at 1472. Instead, each factor must be considered in determining "whether the balance of equities weighs toward granting the injunction." *United Indus. Corp.*, 140 F.3d at 1179; *see also Dakota Indus. Inc. v. Dakota Sportswear, Inc.*, 988 F.2d 61, 64 (8th Cir.1993). Moreover, these factors are not to be applied with any sort of mathematical precision. *Dataphase Sys., Inc.*, 640 F.2d at 113. Each case is unique and should be determined on its own facts. *Iowa Paint Mfg. Co.*, 296 F.Supp.2d at 988.

Therefore, the Court's approach needs to "be flexible enough to encompass the particular circumstances of each case." *Dataphase Sys., Inc.*, 640 F.2d at 113; *see also Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir.1999) ("When applying the *Dataphase* factors, ... 'a court should flexibly weigh the case's particular circumstances ....'") (quoting *United Indus. Corp.*, 140 F.3d at 1179 (citations omitted)). However, if the Plaintiff is unable to show a likelihood of success on the merits or the threat of irreparable injury, the third and fourth *Dataphase* factors are insufficient on their own to support a preliminary injunction. *Microware Sys. Corp. v. Apple Computer, Inc.*, 126 F.Supp.2d 1207, 1218–19 (S.D.Iowa 2000).

---

This information is also provided in the student handbook for Perry High School, albeit in somewhat more adolescent language and explanation. The handbook does not state any requirement for making a formal complaint of discrimination or sexual harassment. The handbook does, however, provide the name and contact number for Ms. Hoobin, the District compliance officer.

The burden is on the movant to show that a motion for preliminary injunction should be granted. *Baker Elec. Co-op., Inc.*, 28 F.3d at 1472; *see also Sports Design & Dev., Inc. v. Schoneboom,* 871 F.Supp. 1158, 1163 (N.D.Iowa 1995) (finding " 'plaintiff bears the burden of proof concerning the four factors.' ") (quoting *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987)). This is a heavy burden, *United Indus. Corp.,* 140 F.3d at 1179, especially where " 'granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits.' " *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 486 (8th Cir.1993) (quoting *Dakota Indus., Inc. v. Ever Best Ltd.,* 944 F.2d 438, 440 (8th Cir.1991)). "Caution must therefore be exercised in a court's deliberation, and 'the essential inquiry in weighing the propriety of issuing a preliminary injunction is whether the balance of other factors tips decidedly toward the movant and the movant has also raised questions so serious and difficult as to call for more deliberate investigation.' " *United Indus. Corp.,* 140 F.3d at 1179 (quoting *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 624–25 (8th Cir.1987)); *see Dataphase Sys., Inc.,* 640 F.2d at 113 ("At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.").

"Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation." *Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207, 217 (4th Cir.1993). Moreover, "injunctive relief should be no more burdensome to the defendant than is necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

## B. Likelihood of Success on the Merits

Plaintiff has asserted claims for violation of his First Amendment rights of free speech and expression, as well as claims based on equal protection, due process, and false arrest. All of these claims have been brought under 42 U.S.C. §§ 1983, 1985, or 1986. In addition, Doe has also asserted a claim for money damages pursuant to Title IX. To ultimately succeed under section 1983, Plaintiff must demonstrate that the conduct complained of was "committed by a person acting under color of state law," and that such conduct deprived Plaintiff of "a right secured by the Constitution and laws of the United States." *Roe v. Humke,* 128 F.3d 1213, 1215 (8th Cir.1997) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). Moreover, on the eve of the fiftieth anniversary of the seminal Supreme Court decision in *Brown v. Board of Education,* the Court notes a federal court may intervene when the actions of local school districts run contrary to the Constitution. *Colin ex rel. Colin v. Orange Unified Sch. Dist.,* 83 F.Supp.2d 1135, 1141 (C.D.Cal.2000); *see, e.g., Brown v. Bd. of Educ. of Topeka, Kan.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (desegregating public schools and finding that separate is not equal).

While Doe's First Amendment claim is seemingly at the center of whether the Court should issue a preliminary injunction based on what Plaintiff requests in the injunction, Plaintiff contends all of the issues asserted are interrelated and must be considered by the Court in making its determination. While the Court finds this position tenuous legal analysis, the Court does find there is value at this stage of the proceeding, and under the unique circum-

stances of this case, to assess the Plaintiff's contentions on each of his claims and review what effect, if any, that has on the over-all determination of the propriety of a preliminary injunction as requested by Plaintiff.

The Court observes that " 'adjudication of a motion for a preliminary injunction is not a decision on the merits of the underlying case.' " *Branstad v. Glickman*, 118 F.Supp.2d 925, 939 (N.D.Iowa 2000) (quoting *Hubbard Feeds*, 182 F.3d at 603). Rather, the assessment of the likelihood of success on the merits factor essentially requires the movant find support for its position in governing law. *Id.* (quoting *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224, 1247 (N.D.Iowa 1995)).

## 1. First Amendment Claim

■ The First Amendment, applicable to the States through the Fourteenth Amendment, states that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. While the First Amendment prohibits the government from limiting or prohibiting speech, this guarantee is not absolute. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *see also Vives v. City of New York*, 305 F.Supp.2d 289, 298 (S.D.N.Y.2003) ("The primacy of the First Amendment is not, of course, absolute—it does not provide for unfettered free expression."). For example, the First Amendment does not protect "certain categories of speech including defamation, incitement, obscenity, and pornography produced with real children." *Free Speech Coalition*, 535 U.S. at 245–46, 122 S.Ct. 1389. In addition, "fighting words" are not protected speech, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382–83, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (citing *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766), nor are "true threats,"

*Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), because "[a] state may punish words 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.' " *Vives*, 305 F.Supp.2d at 289 (quoting *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766). "Fighting words" are "words that are likely to provoke a violent reaction when heard by an ordinary citizen," *id.*, while "true threats" are "serious expression[s] of an intent to commit an act of unlawful violence to a particular individual or group of individuals," *Black*, 538 U.S. at 359, 123 S.Ct. 1536. Thus, fighting words and threats of violence fall into the realm of speech that the government can proscribe or limit without offending the First Amendment. *See Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (fighting words); *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (true threats).

■ The government is permitted to regulate speech falling into the aforementioned categories because "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766. Specifically, the government can restrict conduct that involves speech if the limitation is narrowly tailored and advances an important government interest. *See R.A.V.*, 505 U.S. at 381–91, 112 S.Ct. 2538 (1992). Indeed, "[w]here the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *Id.* at 390, 112 S.Ct. 2538.

■ The First Amendment does, however, protect communications outside of the nonprotected speech categories even if

that speech is "distasteful or discomforting". *See Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919). Even this speech is protected and may not be punished. *See Black,* 538 U.S. at 367, 123 S.Ct. 1536 (finding statute prohibiting cross burning was unconstitutional insofar as it presumed the act of burning a cross was prima facie evidence of an intent to intimidate); *R.A.V.,* 505 U.S. at 391, 112 S.Ct. 2538 (finding cross burning statute unconstitutional as it discriminated in the basis of content and viewpoint); *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (protecting the right to burn the American flag as protected under the First Amendment even though such an expression is found by many to be disrespectful and distasteful). "While it is difficult to articulate generalized standards as to the quantum and quality of proof necessary to justify abridgment of First Amendment rights," it is a heavy burden. *Gay Lib v. Univ. of Missouri,* 558 F.2d 848, 854, 855 n. 15 (8th Cir.1977).

It is universally accepted that students at public schools do not "shed their First Amendment rights of freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). "Moreover, it is also axiomatic that the First Amendment must flourish as much in the academic setting as anywhere else." *Gay Lib,* 558 F.2d at 857 (citing *Papish v. Univ. of Missouri Curators,* 410 U.S. 667, 671, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973), and *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)). In addition, "[s]chool officials do not possess absolute authority over their students." *Tinker,* 393 U.S. at 511, 89 S.Ct. 733. "Courts have historically recognized the tension between a public school's responsibility to maintain a safe environment conducive to learning and its equally compelling mandate to allow for the exercise of constitutional expression." *Chambers,* 145 F.Supp.2d at 1071.

█ School officials may, therefore, restrict student speech or expression where it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker,* 393 U.S. at 511, 89 S.Ct. 733 (citing *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir.1966)). Courts have recognized that the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings. *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *see also New Jersey v. T.L.O.,* 469 U.S. 325, 340–42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (finding public school students do not have the same expansive rights under the Fourth Amendment to be free from search and seizures); *Grayned v. City of Rockford,* 408 U.S. 104, 117–18, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (stating "nowhere [has the Court] suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purposes."). The freedom to advocate a particular idea is by no means absolute and must be balanced against society's countervailing interest of establishing a proper learning environment for this nation's youth and teaching them social mores and values. *Bethel,* 478 U.S. at 681, 106 S.Ct. 3159; *Tinker,* 393 U.S. at 508–09, 89 S.Ct. 733; *cf. Colin,* 83 F.Supp.2d at 1141 ("Though the state education system has the awesome responsibility of inculcating moral and political values, that does not permit educators to act as 'thought police' inhibiting all discussion that is not approved by, and in accord with the official position of the state.").

For example, the Eighth Circuit has applied the Supreme Court's reasoning in

*Watts* in finding that a school district can proscribe threats of violence in the school setting. *Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616, 622 (8th Cir.2002). The court determined that a threat exists when a "reasonable recipient" would interpret the "purported threat as a serious expression of an intent to cause a present or future harm," and that these threats can be prohibited by the school. *Id.* at 622–23 (quotations and citations omitted).[17] In addition, schools may also discipline a student for using sexually explicit language in a school assembly. *Bethel,* 478 U.S. at 683, 106 S.Ct. 3159; *see also Poling v. Murphy,* 872 F.2d 757, 758 (6th Cir.1989) (affirming punishment of a student by school officials after the student insulted a vice principal during a speech at a mandatory school assembly and finding the discipline did not violate the First Amendment). In finding this speech was not protected under the First Amendment, the Supreme Court reasoned that "the schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in [an environment] that tolerates lewd, indecent, or offensive speech." *Bethel,* 478 U.S. at 683, 106 S.Ct. 3159; *see also F.C.C. v. Pacifica Found.,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (finding FCC could regulate indecent communications broadcast over the radio during hours when children would be listening because there is a state interest in protecting minors from exposure to vulgar and offensive language).

■ In finding school officials could not ban students from wearing black armbands in protest of the Vietnam War, the Supreme Court in *Tinker* found that such expression or speech could not be prohibited merely because school officials had an "urgent wish to avoid the controversy which might result from the expression," *Tinker,* 393 U.S. at 510, 89 S.Ct. 733; because other students made hostile remarks to those students wearing armbands, *id.* at 508, 89 S.Ct. 733; because students argued in classrooms about the issue rather than paying attention, *id.* at 518, 89 S.Ct. 733 (Black, J., dissenting); or because student reactions to the black armbands might lead other students to cause a disturbance or initiate an argument or other violence, *id.* at 508, 89 S.Ct. 733. In short, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* Indeed, the Supreme Court specifically restricted school officials' authority to restrict student expression only to circumstances where the speech or expression would interfere greatly with schoolwork or the school's ability to discipline. *Id.* at 511, 89 S.Ct. 733.

In *Tinker,* the Supreme Court reiterated the views expressed earlier by the Court in *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). It stated:

Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Consti-

---

**17.** The factors delineated by the court to determine how a reasonable recipient would view the threat include:

(1) the reaction of those who heard the alleged threat; (2) whether the threat was conditional; (3) whether the person who made the alleged threat communicated it directly to the object of the threat; (4) whether the speaker had a history of mak-

ing threats against the person threatened; and (5) whether the recipient had a reason to believe that the speaker had a propensity to engage in violence.

*Pulaski County Special Sch. Dist.,* 306 F.3d at 623 (citing *United States v. Dinwiddie,* 76 F.3d 913, 925 (8th Cir.1996)). This is a non-exhaustive list of factors. *Id.*

tution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 509, 89 S.Ct. 733. In *Terminiello*, the Supreme Court concluded it was a violation of the First Amendment to arrest a speaker because his speech "stirred people to anger, invited public dispute, or brought about a condition of unrest." *Terminiello*, 337 U.S. at 5, 69 S.Ct. 894. The Court stated further that

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, ... is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.... There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of idea, either by legislatures, courts, or dominant political community groups.

*Id.* at 4–5, 69 S.Ct. 894 (internal citations omitted).

Plaintiff cited extensively to *Vives v. City of New York* in both his written filings and in oral argument on the motion. *Vives* is a recent federal court decision where the plaintiff was arrested and charged with violating a city statute that essentially outlawed communications made with the intent to "annoy" or "alarm". *Vives*, 305 F.Supp.2d at 293–94. Vives mailed communications to people of the Jewish faith intending to alarm them and was arrested for that conduct when one of the recipients contacted law enforcement and stated she found the communication "alarming and/or annoying." *Id.*

Vives initiated a legal action alleging the arrest violated his First Amendment rights. *Id.* at 293. The court concluded that the communications were "firmly protected by the First Amendment, and may not be proscribed or punished." *Id.* at 306. The court further found Vives could possibly be entitled to damages for the violation of his First Amendment rights. *Id.* at 304.

■ At the center of the *Vives* case, however, was a statute that ultimately was found to violate the Constitution. In this case, however, there is no such offending policy, rule, regulation, or statute. On the contrary, the policy most relevant to the May 8 altercation is the School policy prohibiting fighting.[18] This policy is both content neutral and viewpoint neutral. The school has a strong interest in maintaining order over student behavior to promote a quality learning environment, and the anti-

---

18. There may also be an issue under *Pulaski County Special Sch. Dist.* as to whether statements made by Doe would fall into the category of threats, which are not protected and which the District may prohibit. There is some evidence on the record that Plaintiff had in the past responded to harassment by stating "do you want me to beat your ass now or later?" The Court need not reach this issue, however, as the Court finds the actions of Defendants following the May 8 altercation were related to the School's policy against fighting or the City ordinance's related to fighting.

fighting policy helps to promote this interest. As Defendants state, "[r]egardless of the message a student is trying to convey or defend, the physical act embodying the expressive component exempts it from constitutional protection . . . ."

Defendants have stated that they have no objection to Plaintiff expressing himself regarding his perceived sexuality in the school hallways. Moreover, Defendants stated they have no intention to interfere with the Plaintiff's exercise of his First Amendment rights. Indeed, Plaintiff has failed to provide the Court with any evidence tending to show that Defendants had in the past interfered with or restrained Doe's right to speak or express himself in response to any harassment he has been subjected to. The only possible direct interference with Plaintiff's expressive liberties came when expression of Doe's rights led to a fight in which he was involved.

In his verified affidavit, Officer Jans recounted the events surrounding the May 8 altercation as follows: [19]

> On this date between 3rd and 4th hours in the Perry High School [Doe] attempted to talk to [Student 1] about things [Doe] had heard [Student 1] was saying. [Student 1] kept walking past [Doe] to his locker when [Doe] was attempting to talk to him. [Doe] followed [Student 1] to his locker and attempted to get answers to his questions . . . . [Student 1] was reported as throwing punches.

Plaintiff argues that this account proves that he was doing nothing more "simply exercising his expressive liberties by speaking up and out against a fellow student who was engaging in hate-based statements and threats." Doe further notes that he allegedly engaged in the described conduct on the advice of Officer Jans.

Plaintiff fails to note, however, that he did more than merely speak out. He was also witnessed pushing his alleged harasser, and in fact Doe himself stated he pushed the other student at least three times, though characterized as in defense. The evidence indicates that the District officials' response and that of Officer Jans was based on the conduct of fighting, and not as a way to punish Doe for speaking out against harassment or to restrain Doe in the future from speaking out. Furthermore, Doe did more than just speak out against the harassment he was subjected to. In Doe's own account of the altercation, he followed his alleged harasser to his locker, even after the other student originally avoided a confrontation by ignoring Doe and continuing past him to his locker. Thus, while *Tinker* and *Terminiello* protect speech that may cause others to anger, Doe in this case did intrude in the lives of others and did more than condemn the crowd. *See Tinker*, 393 U.S. at 514, 89 S.Ct. 733 (finding students with armbands "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others."); *Terminiello*, 337 U.S. at 3, 69 S.Ct. 894 (finding a statute unconstitutional after an individual was arrested for speaking at an engagement where he deliberately antagonized and condemned a waiting, already hostile crowd).[20] In addition, "[t]he undoubted

---

**19.** Plaintiff's Exhibit 5.

**20.** The Court is by no means finding Doe was the aggressor in the May 8 altercation, nor is the Court finding his actions were not reasonable or premised on self-defense; rather, the Court finds Plaintiff failed to link the Defendants' actions to a restraint on Doe's First Amendment freedoms. Instead, the Court finds the evidence strongly indicates the District and School officials were operating out of a concern for their students and acted as a direct result of the fighting that broke out between Doe and the other student involved in the altercation.

freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially acceptable behavior." *Bethel,* 478 U.S. at 681, 106 S.Ct. 3159.

Doe argues that on May 8, the actions of District officials and Officer Jans functioned as a restraint on his First Amendment freedoms. Doe urges the Court to infer that the purpose of the disciplinary action was to stifle Doe's expressive liberties. Prior to May 8, Doe asserts that he was restrained, albeit an implied restraint, based on Defendants' failure to adequately respond to his complaints of harassment. He contends the inaction of District officials prior to May had a chilling effect on his First Amendment rights.

The Court finds that in the absence of direct evidence of interference by Defendants in Plaintiff's efforts to express himself, the alleged implied restraint that existed prior to the May 8 events is insufficient to find a likelihood of success on the merits. In addition, the Court finds Plaintiff has failed to make the required showing that the disciplinary actions stemming from the May 8 altercation were intended to interfere with his First Amendment rights. While the investigation into the May 8 altercation may not have been thorough, this alone is not enough for the Court to presume or even infer that the true purpose of Defendants in undertaking the disciplinary measures employed was to silence Plaintiff. Defendants punished both students equally without regard to level of culpability.

The Supreme Court has "recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary measures," which the courts should respect. *T.L.O.,* 469 U.S. at 339–40, 105 S.Ct. 733. This

Court finds the most rational and reasonable inference in the present case is that Defendants were disciplining Doe based on the conduct he engaged in, i.e., fighting, and not anything he may have said to his alleged harasser. There is even less proof that Defendants intended the school suspension and arrest to restrain Doe from speaking out in the future about harassment based on sexual orientation.

In short, the Court is unable to find Plaintiff has exhibited a likelihood of success on his First Amendment claims. Moreover, Doe has not adequately shown a restraint on his First Amendment rights that would warrant the relief requested as related to protecting those rights.

Defendants contend that Plaintiff's requested relief would grant legal protection to established categorical exceptions of the First Amendment. By essentially granting Doe immunity from school punishment for speaking out, the Court could potentially grant Doe the unfettered ability of engaging his expressive liberties in the form of fighting words or direct threats, both exceptions to First Amendment protections. *See Wildman ex rel. Wildman v. Marshalltown Sch. Dist.,* 249 F.3d 768, 771 (8th Cir.2001) (recognizing that the "right to express opinions on school premises is not absolute"). While the Court has the ability to fashion a preliminary injunction that would have avoided this situation, the Court need not address Defendants' contentions any further than noted as the Court has already determined above that the current record does not demonstrate Doe is likely to succeed on the merits of his First Amendment claim.

■ Defendants also assert that *Tinker* and *Bethel* together stand for the proposition that "a school retains the right to discipline a student for (1) expression which would substantially disrupt or interfere with the educational atmosphere, or

(2) expression which is lewd or offensive." Defendants argue that Plaintiff's requested relief would violate these school settings principles.[21] Again, the Court need not address Defendants' contentions on this issue any further because of the Court's essential findings.[22]

## 2. Equal Protection and Due Process Claims

The Equal Protection Clause of the Fourteenth Amendment provides that a state shall not "deny to any person within its jurisdiction equal protection of the laws." U.S. Const. amend. XIV. The Constitution "neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting). Indeed, "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37–38, 48 S.Ct. 423, 72 L.Ed. 770 (1928). "Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts

---

**21.** Defendants' argument on this point is somewhat incongruous as the communication punished in *Bethel* differs markedly from that in the present case. *Bethel* involved a sexually explicit speech given by an older student in a mandatory assembly at which much younger students were present and unable to leave. *Bethel*, 478 U.S. at 677–78, 106 S.Ct. 3159. On the other hand, in this case, Doe merely seeks to be able to speak out against hate-based harassment and discrimination on the basis of sexual orientation. Just because the disputed expressive topic involves "immature opinions of sexual orientation" does not mean Doe in speaking out would engage in any sort of lewd or offensive communication, and especially not to a large, captive audience such as that assembled at a school assembly.

**22.** Defendants also advance the argument that the injunction erroneously classifies school hallways as public forums and creates an unlawful distinction between Plaintiff's expression and the expression of other students at Perry High School. Public forum analysis commences when the speech in question is protected by the First Amendment and plaintiff seeks to engage in the expression in any public setting. *See Embry v. Lewis*, 215 F.3d 884, 888 (8th Cir.2000).

Public schools are not deemed public forums unless "school authorities have 'by policy or practice' opened those facilities for indiscriminate use by the general public." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Indeed, courts have found that a school newspaper is not a public forum, *id.*, and that a school mailbox system is not a public forum, *Perry Educ. Ass'n*, 460 U.S. at 48, 103 S.Ct. 948, such that school officials could exclude certain type of student expression or dissemination of materials. In addition, government ownership of school property does not automatically render that property as a public forum. *Embry*, 215 F.3d at 888. In finding school hallways were not public forums, the court in *Embry* concluded school officials were empowered to prohibit unauthorized behavior "provided that the restrictions here are reasonable and are not an effort to suppress opposing viewpoints." *Id.* at 889.

Defendants admit that they could not have a per se ban on speech related to sexual orientation. Defendants contend, however, that they may prohibit conduct accompanied by speech if doing so advances an important government interest and are reasonable. Defendants further assert that even if the School hallways are public forums, Plaintiff's requested relief is overbroad such that it would transform the public forum into an illegal limited access public forum beyond constitutional protection in that it would grant Doe broader rights to argue and fight about his perceived sexual orientations as compared to other students' expressive rights.

While Defendants make good arguments, the Court need not assess them any further as the Court has previously determined Plaintiff is unlikely to succeed on the merits of his First Amendment claims because Plaintiff is unable to show an unreasonable restraint on those freedoms that would give rise to the relief requested in the injunction.

remain open on impartial terms to all who seek assistance." *Romer v. Evans,* 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (addressing the constitutionality of a statute that discriminated against homosexuals).

■ The Supreme Court has interpreted the Equal Protection Clause to prevent arbitrary gender-based discrimination. *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (finding that "[t]o give a mandatory preference to members of either sex over members of the other, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause"). In addition, discrimination based on "gender-based generalizations" is violative of the Equal Protection Clause. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 645, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). This means that state sponsored educational institutions may not discriminate based upon an alleged gender stereotype. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 725, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

■ In addition, discrimination based on sexual orientation is prohibited by the Equal Protection Clause. *See Montgomery v. Indep. Sch. Dist.,* 109 F.Supp.2d 1081, 1088 (D.Minn.2000); *see also Nabozny v. Podlesny,* 92 F.3d 446, 457 (7th Cir.1996) (finding "the Constitution prohibits intentional invidious discrimination between otherwise similarly situated persons based on one's membership in a definable minority, absent at least a rational basis for the discrimination" and "[t]here can be little doubt that homosexuals are an identifiable minority subjected to discrimination in our society"). In the Eighth Circuit, discrimination based on sexual orientation is subject to rational basis review. *Montgomery,* 109 F.Supp.2d at 1089 (citing *Richenberg v. Perry,* 97 F.3d 256, 260–61 (8th Cir.1996)). Under the rational basis standard, a plaintiff has the burden of showing that the challenged state action is "not rationally related to any legitimate government purpose." *Richenberg,* 97 F.3d at 260–61; *see also Nabozny,* 92 F.3d at 458 (7th Cir.1996) (finding under rational basis review there is no constitutional violation if " 'there is any conceivable state of facts' that would establish a rational basis for the state action.") (quoting *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313–14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).

In *Montgomery,* a student brought an action against the school district for failure to prevent harassment by other students over a period of several years where the harassment was allegedly based on plaintiff's sexual orientation. *Montgomery,* 109 F.Supp.2d at 1084–86. The plaintiff asserted claims under both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *Id.* at 1088–89. The court found the plaintiff could assert a cognizable claim under the Equal Protection Clause based on the school district's failure to prevent harassment and discrimination based on sexual orientation. *Id.; see also Romer,* 517 U.S. at 633–36, 116 S.Ct. 1620.

In a case strikingly similar to the present action before this Court, the Seventh Circuit also found that a school district's failure to protect a student from student-on-student harassment based on sexual orientation was constitutionally prohibited. *See Nabozny,* 92 F.3d at 458; *cf. Henkle v. Gregory,* 150 F.Supp.2d 1067 (D.Nev. 2001) (discussing the claims brought by a high school student against the school district and individual officials based on the alleged violation of his rights when defendants ignored his complaints of harassment based on his sexual orientation). The plaintiff in *Nabozny* was subjected to outrageous and egregious harassment and physical abuse by his fellow students be-

cause he was homosexual.[23] *Nabozny*, 92 F.3d at 451–52. Nabozny repeatedly reported the harassment to school officials, but their response to his complaints was not only non-existent, but overall disheartening. *Id.* at 452. Not only did they fail to discipline the offending students and protect Nabozny, but school officials also laughed off his repeated requests despite the escalating nature and inherent danger in the harassment and physical abuse Nabozny experienced. *Id.*

In *Nabozny*, the plaintiff presented evidence that other forms of harassment and physical assaults received a much different response from the school than did Nabozny's complaints. *Id.* at 454–55. The court noted that while the school district may have otherwise enforced its harassment policy, the evidence suggested it "made an exception to their normal practice in Nabozny's case," apparently because his harassment was based on sexual orientation. *Id.* at 454. Because "[i]t is well settled law that departures from established practices may evince discriminatory intent," the court found plaintiff's evidence was sufficient to state a claim under the Equal Protection Clause for defendant's failure to protect him from harassment based on his sexual orientation. *Id.* at 455, 458.

 In the present case, Doe has made credible assertions that he has been subjected to numerous incidents of harassment, threats, and physical assaults over a period of more than three years. Doe asserts the evidence will establish that Defendants deliberately ignored his repeated complaints about the harassment, and that meanwhile, the District and its officials took affirmative steps to prevent other forms of harassment when brought to their attention. Plaintiff asserts that, similar to the defendants in *Nabozny* and *Montgomery*, the Defendants here can offer no rational basis for permitting student to harass Doe as a result of his perceived sexual orientation while protecting other students from similar forms of harassment.

At this stage of the proceedings, Plaintiff's evidence as to the different reactions of Defendants to different harassment is minimal. There was some testimonial evidence presented that a lengthy suspension was issued to a student that called some female students "dykes" during class.[24] In addition, School officials testified that they took seriously discipline for harassment and physical assault based on gender or race, but further denied they treated Doe's complaints any differently. Doe has, however, presented some evidence that his complaints went largely unheeded by Defendants. Other than two occasions, the May 8 altercation and the cell phone screen incident, disciplinary measures taken against alleged harassers did not in-

---

**23.** The Court notes some differences between the facts in *Nabozny* and the present action. First, the harassment and physical abuse encountered by Nabozny was much more severe than that in evidence on the record in the present case, eventually resulting in Nabozny being hospitalized following one attack. In addition, the response of school officials was much more egregious as they at times literally laughed at Nabozny's complaints despite a history of requested help from both Nabozny and his parents. Also, Nabozny was able to offer compelling evidence that while the school district otherwise enforced its harassment policy, it made an exception in Nabozny's case, an offer of proof Plaintiff in this case has not yet had the full opportunity to make. Finally, Nabozny was an admitted homosexual and this fact was common knowledge whereas in this case, Doe is merely alleging harassment based on his *perceived* sexual orientation. Whether these differences are important is a question for a later time.

**24.** There is evidence, however, that this student had a long history of behavioral problems and that less severe disciplinary measures had been used in prior incidents with little success.

volve any sort of suspension. In addition, the discipline for the cell phone screen incident was reduced from the punishment as originally determined.

On the other hand, reaction by school officials was not totally lacking as it was in *Nabozny* and *Montgomery*. Indeed, School officials read the District harassment policy to the entire student body of Perry High School at the beginning of this past school year. This was to be the students' only warning. Prior to this, when complaints were received from Doe, District officials claimed they met with the offending student, discussed the incident, and gave a warning that future harassment would not be tolerated. Doe does not present any evidence that this warning was not successful. To the contrary, one witness testified that while the students that were spoken to stopped engaging in harassing conduct for a time, someone else was always there to fill the void. However, there is some indication according to the evidence on the record that the Defendants' response to Doe's complaints was inferior to their response to other complaints.

Based on the foregoing, the Court finds the current record is insufficient to find a likelihood of success on the merits of his equal protection claim. The Court further finds, however, that the relief Doe requests in his preliminary injunction is not related to his likelihood of success on this issue. The evidence in the record indicates the School is already enforcing its harassment policy, and counsel for Defendants stated it was Defendants' intention to enforce their harassment policy. The other relief sought in the preliminary injunction is related to Plaintiff's First Amendment claim. Doe has not presented any evidence whereby the Court can assess his likelihood of success on the merits on his due process claim.[25]

### 3. Title IX Claims

Title IX of the Education Amendments of 1972 provides the following:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving financial assistance.

29 U.S.C. § 1681(a). Magistrate Judge Jarvey of the Northern District of Iowa explained that

---

**25.** The Court notes, however, that, at least in the Seventh Circuit, "local school administrations have no affirmative duty to protect students." *Nabozny*, 92 F.3d at 459 (citing *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272–73 (7th Cir.1990)). The Seventh Circuit based this finding on the Supreme Court decision in *DeShaney v. Winnebago County Department of Social Services* to find school administrators do not have a "special relationship" with students and that "[a]bsent a 'special relationship,' a state actor has no duty to protect a potential victim." *Id.* (citing *J.O.*, 909 F.2d at 272–73); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

The *Nabozny* court went on to agree in principle that a defendant could be liable under a due process theory if the plaintiff is able to show the defendant "created a risk of harm, or exacerbated an existing one." *Nabozny*, 92 F.3d at 460. Like Nabozny, Doe's claim "suffers from a paucity of evidence", *id.*, at this stage of the proceedings. In fact, there is testimonial evidence that Defendants tried to prevent harm from befalling Doe by limiting his interaction with fellow students to supervised, classroom settings. At some point, Doe was allowed to move between classes at times when the hallways were clear and eat lunch in isolation in order to avoid students that could harass or attack him. Doe was provided with a variety of options in an effort to control his school environment. Eventually, the District allowed and participated in Doe's home schooling when he felt he was still unsafe at school.

Courts have interpreted Title IX to prohibit gender discrimination against students enrolled in federally supported educational programs and employees involved in such programs. *Murray v. N.Y. Univ. College of Dentistry,* 57 F.3d 243, 248 (1995). Under Title IX, an aggrieved individual has an implied right of action, *see Cannon v. Univ. of Chicago,* 441 U.S. 677, 688–89, 99 S.Ct. 1946, 1953–54, 60 L.Ed.2d 560 (1979), for both injunctive relief and money damages. *See Franklin v. Gwinnett County Public Schs.,* 503 U.S. 60, 71–73, 112 S.Ct. 1028, 1035–37, 117 L.Ed.2d 208 (1992). Moreover, the Supreme Court has stated that if Courts are to give Title IX "the scope that its origins dictate, [they] must accord it a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1917–18, 72 L.Ed.2d 299 (1982).

*Wright ex rel. Wright v. Mason City Cmty. Sch. Dist.,* 940 F.Supp. 1412, 1415–16 (N.D.Iowa 1996).

▮▮ Thus, under Title IX a student can state a claim for monetary damages by asserting the school district intentionally failed to intervene to end the sexual harassment of a student. *Franklin,* 503 U.S. at 75, 112 S.Ct. 1028. As the Supreme Court reasoned, "Congress surely did not intend for federal monies to be expended to support the intentional actions it sought by statute to proscribe." *Id.; see also Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 631, 643, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (*Davis I* ) (acknowledging that student-on-student harassment may give rise to a private right of action against a school district under Title IX).

*Franklin* analogized sexual harassment in schools to that of sexual harassment taking place in the workplace, and concluded that students should have the same protection in schools that employees have

in the workplace. *Id.* In adopting the *Franklin* analysis in a case involving the alleged sexual harassment of a student by fellow classmates, the Eleventh Circuit made the following observation:

> The damage caused by sexual harassment ... is arguably greater in the classroom than in the workplace, because the harassment has a greater and longer lasting impact on its young victims, and it institutionalizes sexual harassment as accepted behavior. Moreover, as economically difficult as it may be for adults to leave a hostile workplace, it is virtually impossible for children to leave their assigned school.

*Davis v. Monroe County Bd. of Educ.,* 74 F.3d 1186, 1193 (11th Cir.1996) (*Davis II),* rev'd on other grounds, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

Both *Wright* and the two *Davis* decisions held that "when a federally funded educational institution knowingly fails to take steps to remedy a hostile environment created by one student's sexual harassment of another," a violation of Title IX has occurred as "the harassed student has been 'denied the benefits of, or been subjected to discrimination under the educational program.'" *Wright,* 940 F.Supp. at 1417 (citing *Davis II,* 74 F.3d at 1194); *Davis II,* 74 F.3d at 1193 ("Title IX encompasses a claim for damages due to a sexually hostile educational environment created by a fellow student or students when the supervising authorities knowingly fail to act to eliminate the harassment.").

▮▮ In other words, a school district "may be liable for subjecting [its] students to discrimination where the recipient [of federal funds] is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Davis I,* 526 U.S. at 647, 119 S.Ct. 1661.

Where misconduct occurs during school hours and on school grounds, it is indeed taking place under the operation of the funding recipient. *Id.* at 646, 119 S.Ct. 1661; *see also Doe v. Univ. of Illinois,* 138 F.3d 653, 661 (7th Cir.1998) (judgment vacated and remanded fro further review in light of *Davis I*) (finding liability where school failed to properly respond to student-on-student harassment which took place while the students were involved in school activities or under the direct supervision of school employees). This is because the school district "retains substantive control over the context in which the harassment occurs," and more importantly, because district officials exercise "significant control over the harasser." *Davis I,* 526 U.S. at 646, 119 S.Ct. 1661. Therefore, if a school's response to harassment is clearly unreasonable, or a response is unreasonably lacking, under the circumstances, then the school may deemed deliberately indifferent sufficient to establish liability under Title IX. *Id.* at 648, 119 S.Ct. 1661.

■ However, for a student to "state a claim for monetary damages for a school district violation of Title IX," the student must allege "that the school district *intentionally* failed to intervene and put a stop to the harassment." *Wright,* 940 F.Supp. at 1416 (emphasis added). A school district cannot be held liable under Title IX "for its *negligent* failure to remedy the sexually harassing behavior by a student's peers despite its knowledge of such behavior." *Id.* at 1419.

■ In addition, the Supreme Court held that the sexual harassment in Title IX liability cases must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis I,* 526 U.S. at 650, 119 S.Ct. 1661. School officials may only be liable if "deliberately indiffer-

ent" to such harassment. *Id.* This does not mean the alleged victim needs to show actual physical deprivation of access to school resources to be successful. *Id.* at 651, 119 S.Ct. 1661. Rather, the alleged victim of the harassment must show the sexual harassment is sufficiently severe and pervasive such that it "undermines and detracts from the educational experience," and that the alleged victim is "effectively denied equal access to an institution's resources and opportunities." *Id.*

■ Courts have determined that "Title VII precedent is appropriate for analyzing hostile environment sexual harassment claims under Title IX." *Wright,* 940 F.Supp. at 1419. Therefore, to be successful under the prevailing standard, the plaintiff must prove

(1) that the plaintiff is a member of a protected group; (2) that the plaintiff was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive as to alter the conditions of plaintiff's education and create an abusive educational environment; and (5) that the educational institution knew of the harassment and intentionally failed to take proper remedial measures because of plaintiff's sex.

*Burrow v. Postville Cmty. Sch. Dist.,* 929 F.Supp. 1193, 1205–06 (N.D.Iowa 1996) (citing *Davis II,* 74 F.3d at 1194; *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and *Harris v. Forklift ·Sys., Inc.,* 510 U.S. 17, 20–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Wright,* 940 F.Supp. at 1419 (quoting *Burrow,* 929 F.Supp. at 1205–06). In light of *Davis I,* the fifth factor is altered slightly to require the educational institution was deliberately indifferent to the harassment.

*Davis I,* 526 U.S. at 650–51, 119 S.Ct. 1661.

In the present case, Doe alleges he was the victim of repeated and unrelenting threats, harassment, assault, and discrimination based on his perceived sexual orientation for over three years. He asserts this harassment was severe, pervasive, and offensive by any objective standard. Doe further contends he reported the conduct he found offensive and degrading to School officials to no avail.

In addition, Doe asserts that the repeated harassment resulted in a hostile environment that has effectively undermined his ability to participate in the educational environment at Perry High School. Indeed, Plaintiff claims this environment forced him to quit the wrestling team, and it is this same hostile environment and the resulting fear for his safety that has caused Doe to forsake classroom instruction and instead be home schooled. Finally, Doe also suggests that he will likely be able to show both actual knowledge and deliberate indifference on the part of Defendants in their failure to properly investigate and put an end to the harassment.

The Court finds Plaintiff has demonstrated some likelihood of success on the merits on his Title IX claim. Plaintiff may ultimately have some difficulty in proving intentional discrimination or deliberate indifference on the part of Defendants, but this is a question for another time as the Court finds that the relief Doe requests in his preliminary injunction does not hinge on his likelihood of success on this issue.

### 4. False Arrest Claim

Plaintiff's Complaint includes a claim pursuant to 42 U.S.C. § 1983 for false arrest. Plaintiff claims that his arrest following the May 8 altercation for disorderly conduct was unconstitutional because Officer Jans did not have a warrant and lacked good faith and probable cause.

A plaintiff may recover civil damages for false arrest in actions brought pursuant to 42 U.S.C. § 1983 if the plaintiff is able to establish the arresting officers lacked good faith and probable cause. *Pierson v. Ray,* 386 U.S. 547, 556–57, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Vives,* 305 F.Supp.2d at 302 (finding court could not conclude as a matter of law that the arresting officers acted in good faith in effectuating the arrest of plaintiff, and therefore the question of whether plaintiff was entitled to damages for the arrest would need to be determined at trial). In order for an arrest to be constitutionally valid, there must exist sufficient probable cause. *See Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991). Sufficient probable cause exists "when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* (citations omitted). Additionally, an arrest resulting solely from the exercise of protected speech violates the First Amendment and the Fourth Amendment's protection from unlawful seizures. U.S. Const. amends. I, IV; *see also Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring) (stating "technical violations of Fourth Amendment rights [occur] where Officers in good faith arrest an individual in reliance on a warrant later invalidated or pursuant to a statute that is subsequently declared unconstitutional"); *Vives,* 305 F.Supp.2d at 301–02.

In addition, in support of the portion of Doe's requested injunctive relief pertaining to the Perry City Police Department, Plaintiff cites to cases where courts have issued preliminary injunctions in cases

arising under section 1983 enjoining prosecutors from bringing charges and enjoining law enforcement from making arrests. *See, e.g., Heartland Acad. Cmty. Church v. Waddle,* 335 F.3d 684 (8th Cir.2003) (upholding issuance of preliminary injunction against a local prosecutor and law enforcement); *Paragould Music Co. v. Paragould, Ark.,* 738 F.2d 973 (8th Cir.1984) (enjoining the mayor, the city police department, and its officers from arresting, attempting to arrest, detaining, harassing, or otherwise intimidating patrons at a video arcade to prevent irreparable harm where the action was brought pursuant to 42 U.S.C. § 1983 and it was alleged defendants were harassing the plaintiff's customers in order to drive plaintiff out of business); *Vives,* 305 F.Supp.2d 289 (issuing preliminary injunction enjoining New York Police Department from arresting the plaintiff for violating a law insofar as the law had been found to violate plaintiff's constitutional rights).

In the present case, Plaintiff asserts that Officer Jans did not have "reasonably trustworthy information" to believe that Doe had committed the offense for which he was arrested. Doe had an excellent behavioral record throughout his tenure at the School and had not shown himself to be violent, aggressive, or assaultive, or to have any propensities for such behavior. Officer Jans was aware of the circumstances precipitating the altercation, as Doe had approached Officer Jans seeking advice on how to handle the impending situation. In addition, Plaintiff contends Officer Jans, perhaps in conspiracy with the Defendant school officials, lacked good faith in arresting Doe.

Plaintiff admits that the Court cannot enjoin law enforcement from fulfilling its duties when someone commits a public offense that is not protected speech. Doe requests the Court specifically limit the requested injunction as it pertains to law enforcement to avoid any such reading. As Plaintiff's counsel so descriptively stated, Doe "ought to be able to speak out in the lunchroom against someone who's lodging hate-based harassment and vulgar statements against him, but he ought not be able to get up on [the] table and throw food."

The Court finds, however, that Plaintiff has failed to demonstrate a likelihood of success of the merits on his claim for false arrest. Consequently, the Court need not engage in any determination as to how to appropriately tailor a preliminary injunction to law enforcement in the present case.

Plaintiff's claim on this issue suffers from the same deficiency as his First Amendment claim, i.e., the connection between the arrest and Plaintiff's engaging in speech protected by the First Amendment such that the arrest could be inferred to be a restraint on that freedom. Officer Jans was acting in response to a fight in the hall-ways of the school. Both students involved, regardless of culpability, were arrested and charged with disorderly conduct. Plaintiff is unable to demonstrate a connection beyond the bald assertion that the Court must infer the connection that the arrest was employed to restrain Plaintiff from engaging in constitutionally protected conduct. As a result, the Court finds the record does not support any type of injunction against the City of Perry, the City's police department, Officer Jans, or the resource officer assigned to the school.

**C. Irreparable Harm**

To warrant issuance of a preliminary injunction, the movant must demonstrate there exists a sufficient threat of irreparable harm, as the basis for injunctive relief is that level of harm and the inadequacy of remedies to address it. *Branstad,* 118 F.

Sup.2d at 941 (citations omitted). The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

Plaintiff attempts to illustrate the irreparable harm he will endure without issuance of a preliminary injunction by referencing several equal access cases. While ultimately the Court finds these cases unpersuasive as the circumstances in the present case differ markedly from those in the equal access cases, the Court notes the discussion in these cases is somewhat helpful. Thus, while distinguishable, the Court briefly touches on the decisions in those cases and the analysis engaged in by the respective courts.

The cases cited by Plaintiff, among others found by the Court, to support his supposition that failure to grant the preliminary injunction will result in irreparable harm primarily concern the ability of clubs to meet on school grounds under the First Amendment and the Equal Access Act ("EAA"), 20 U.S.C. § 4071 et seq. *See, e.g., Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyde County, KY,* 258 F.Supp.2d 667 (E.D.Ky. 2003); *Colin,* 83 F.Supp.2d 1135; *East High Gay/Straight Alliance v. Bd. of Educ. of Salt Lake City Sch. Dist.,* 81 F.Supp.2d 1166 (D.Utah 1999); *see also Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3,* 85 F.3d 839 (2d Cir.1996). The Court notes that the EAA is patterned in part on the *Tinker* decision. *Boyd County,* 258 F.Supp.2d at 689. Moreover, the First Amendment analysis is similar whether dealing with groups (such as clubs) or individuals. *Colin,* 83 F.Supp.2d at 1140–42; *Boyd County,* 258 F.Supp.2d at 680–81, 688–90; *East High,* 81 F.Supp.2d at 1191–94; *Hsu,* 85 F.3d at 870–72. In addition, *Colin, Boyd County,* and *East High* all involve clubs based on sexual orientation, *Colin,* 83 F.Supp.2d at 1138; *Boyd County,* 258 F.Supp.2d at 670; *East High,* 81 F.Supp.2d at 1175; and while *Hsu* concerns a club based on religious principles, it does contain a good discussion of the First Amendment and the effects of the *Tinker* decision. *Hsu,* 85 F.3d at 870–72.

In *Colin,* the court granted a preliminary injunction in favor of a group of plaintiffs seeking to form a Gay Straight Alliance (GSA) at the school. *Colin,* 83 F.Supp.2d at 1151. In so doing, the court found the students would be irreparably injured by "the inability to effectively address the hardships they encounter at school every day." *Id.* at 1150. The court found that some students did not feel safe using the school restrooms and were harassed with anti-gay epithets. *Id.* The club sought by plaintiffs would provide a safe haven for students where they could feel safe and accepted. *Id.*

In *Boyd County,* the court opined that "[a]bsent a preliminary injunction, [p]laintiffs will be unable to meet at school, unable to benefit from a forum for discussion with other students who are suffering the effects of harassment based on sexual orientation, and unable to work with other students to foster tolerance among all students." *Boyd County,* 258 F.Supp.2d at 692. Likewise, in *East High,* the court granted injunctive relief to a GSA club to permit it to meet at the high school. *East High,* 81 F.Supp.2d at 1184.

Doe asserts that his situation is similar to that encountered by the clubs in the preceding cases. He claims his constitutional and civil rights have been violated, and that the hateful and demeaning acts by his fellow students have caused him to feel unsafe and forced him to be home schooled. Doe claims that when he spoke out against the hate-based discrimination,

harassment, and threats from a fellow student, he was suspended from school and later arrested and charged with disorderly conduct, both unfair and unconstitutional.

Plaintiff argues that without a preliminary injunction, he will effectively be unable to continue at school in a safe manner, he will be unable to benefit from his personal right to speak up and speak out against hate-based harassment based on sexual orientation, and he will be unable to express his views in an attempt to end the vile and distasteful effects of such hate-based harassment by bringing the problem to the attention of reasonable fellow students. He asserts that his ability to engage in such expressive liberties would help foster tolerance among the students, and that without the preliminary injunction, he will be unable to do this. In addition, because graduation is a mere four weeks away, Doe argues that absent a preliminary injunction, he will be unable to participate in many of the memorable final events that cap the long and arduous accomplishment of completing high school.

Defendants seem to rest on the contention that because Plaintiff is currently home schooled, rarely appears on school property, and will soon graduate, he has failed to demonstrate a sufficient threat of irreparable harm. This argument holds little weight because if, as Doe suggests, the reason he is being home schooled is the Defendants' failure to adequately react to and protect him from hate-based harassment, then Doe has shown that he is being harmed. And while he will soon graduate, many of the activities that endure as memories occur towards the end of the senior year, including prom, senior assembly, and graduation. Moreover, as the Supreme Court has found, the deprivation of First Amendment freedoms constitutes irreparable harm. *Elrod*, 427 U.S. at 373–74, 96 S.Ct. 2673.

The current record supports a conclusion that Plaintiff is suffering harm by not having a safe learning environment at Perry High School and will continue to suffer harm by not feeling sufficiently safe to attend school with his classmates. Doe will be further harmed if he does not participate in the upcoming activities related to graduation. The Court is unable, however, to connect the issuance of the requested preliminary injunction with overcoming the harm. As the Court previously determined, Plaintiff's right of freedom of speech or expression has not been restrained by Defendants. Consequently, this factor does not weigh heavily in favor of granting the requested relief.

## D. Balance of Harms

The Court must consider "'the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties.'" *Branstad*, 118 F.Supp.2d at 942 (quoting *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994)). Doe asserts that the balance of harms favors Plaintiff in this case. According to Doe, enjoining the District and its officials in the manner proscribed would entail little or no effort, expense, or other undue burden to Defendants. Defendants would merely be constrained from taking adverse action against Plaintiff for speaking up in the halls of the school against those who direct hate-based threats and harassment against him. Defendants would also be required to fairly enforce a harassment policy that already exists. Neither of these requests requires Defendants undertake any corollary action to comply.

Moreover, Plaintiff asserts that a preliminary injunction would in fact inure to the benefit of the Perry High School populace and the Perry community as a whole

by assisting in the deterrence of hate-based discrimination based upon sexual orientation and would further foster tolerance among the entire student body for, as Justice Douglas stated,

> [i]t is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is affected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.

*Terminiello,* 337 U.S. at 4, 69 S.Ct. 894 (citing *DeJonge v. Oregon,* 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937)). Doe also contends that while some may be stirred to anger, there is no evidence that the expressive speech he seeks to have protected would cause a general disruption in the school.

Meanwhile, Defendants argue that granting the injunction "would not only harm Defendants['] ability to maintain a stable learning environment, but it would also threaten the safety of uninvolved third-party students of whom Defendants are legally responsible for protecting while on school property." Defendants contend these harms outweigh the tenuous rights Plaintiff seeks to have protected by the preliminary injunction.

As the Supreme Court recognized, schools are expected to impress upon students "the shared values of a civilized social order," and the determination of what manner of speech is appropriate for the school properly rests with the school districts and other school officials, and not with the judicial system. *Bethel,* 478 U.S. at 683, 106 S.Ct. 3159. Recent Eighth Circuit decisions support the understanding that schools are granted wide discretion to discipline students for speech that violates school policy. *See, e.g., Pulaski County Special Sch. Dist.,* 306 F.3d 616 (confirming school district's decision to ex-pel a student for the remainder of the school year for writing a threatening letter to a fellow student that was found to be beyond constitutional protection); *Wildman,* 249 F.3d 768 (finding in favor of school district's discipline of student requiring apology to teammates in order to continue participating in school athletics after the student wrote a disturbing and disrespectful letter about her basketball coach that included the word "bullshit", as the district deemed the letter constituted insubordinate speech). While the punishment may be considered harsh, " '[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.' " *Pulaski County Special Sch. Dist.,* 306 F.3d at 627 (quoting *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). Instead, "[t]hose judgments are best left to the voters who elect the school board." *Id.*

Defendants contend that a preliminary injunction stripping them of that discretionary authority to control student behavior will result in a decrease in the overall quality of education, a harm far more serious than any proffered by Plaintiff. Defendants submit that both the school and the student populace will endure substantial harm if the preliminary injunction is granted and that the injunction would disrupt Defendants' ability to effectively operate the school.

The Court finds that the balance of harms weighs slightly in favor of granting the motion for preliminary injunction. Doe is being harmed by not attending school because he feels unsafe. The Court finds little harm would be borne by Defendants if the injunction was issued; indeed, Defendants claim they are already complying with everything Doe seeks in his motion. However, this factor on its own will

not be sufficient to warrant issuance of a preliminary injunction.

### E. Public Interest

The final *Dataphase* factor is consideration of the public interest. *Branstad,* 118 F.Supp.2d at 943 (citations omitted). As noted earlier, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod,* 427 U.S. at 373, 96 S.Ct. 2673; *Chambers,* 145 F.Supp.2d at 1072 ("The public has an unequivocal interest in the protection of First Amendment freedoms for all its members."). Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994). Providing a safe and non-discriminatory environment for students obviously serves the public interest. *See Colin,* 83 F.Supp.2d at 1150–51. In addition, fostering tolerance and thereby decreasing hate crimes among students is in the public interest. *Boyd County,* 258 F.Supp.2d at 692–93.

Plaintiff argues that the injunction he seeks would do nothing more than protect his constitutional rights from being trampled underfoot and would further assist the District and its officials in providing a safe and respectful learning environment for the students at Perry High School.

Defendants point out the harms that the School would be hampered in its ability to maintain a stable learning environment and to third parties whose safety may be threatened. Defendants argue that together these harms have a high public interest that would be undermined by issuance of the preliminary injunction. The public has a strong interest in maintaining an effective, high-quality, and safe educational system that promotes optimal learning. According to Defendants,

"Plaintiff's motion for injunction contradicts these important interests."

The Court recognizes the public interest in fostering tolerance among the young people of society and in providing a safe haven for students wherein all may be afforded the educational opportunities offered. However, this factor gives little weight in support of granting the motion for preliminary injunction. While the Court recognizes the public interest in the end result Doe seeks, the requested relief is not the means to achieve that result. The public interest is not fostered by the imposition of a preliminary injunction to deter an interference with the exercise of expression and free speech that the record fails to demonstrate has occurred or can be expected to occur. Many of the interests Plaintiff asserts are already promoted by the existence of this lawsuit and the implications of any additional harm to the Plaintiff as the case proceeds.

### CONCLUSION

Apart from ultimate determinations of fact and law in this case, it is unfortunate the Plaintiff has felt unable to attend school and participate in the activities of his senior year. It would be even more unfortunate if the parties to this litigation allow the pendency of this lawsuit to halt any additional efforts to find a way to return the Plaintiff to school for these last few weeks. The ultimate path of this case is yet to be determined. The Court today only resolves the specific preliminary injunction issue.

The Court has found insufficient evidence to support any finding that the Defendants have acted to prevent the Plaintiff from exercising his rights of expression and speech. Nor does the record support a conclusion that such interference is threatened. Accordingly, the only matter currently before the Court, the Motion for

Preliminary Injunction, does not prevail. For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction (Clerk's No. 2) must be denied.

**IT IS SO ORDERED.**